### In re SEAGATE TECHNOLOGY II SECURITIES LITIGATION.

**This Document Relates to All Actions.**

**No. C–89–2493(A)–VRW.**

United States District Court, N.D. California.

Feb. 11, 1994.

As Amended March 2, 1994.

**1344**

Steven O. Sidener, Glenn M. Goffin, Gold & Bennett, A Professional Law Corp., San Francisco, CA, Berger & Montague, Sherrie Savett, Todd S. Collins, Philadelphia, PA, Milberg Weiss Bershad Specthrie & Lerach, William S. Lerach, Blake M. Harper, San Diego, CA, for plaintiffs and all others similarly situated.

James A. DiBoise, Mary Anne Rodgers, Sara Harrington, Thomas J. Martin, Wilson, Sonsini, Goodrich & Rosati, A Professional Corp., Palo Alto, CA, for defendants.

### ORDER

WALKER, District Judge.

The complaints in these consolidated securities fraud cases allege that due to improper conduct by the defendants, the price of Seagate common stock was fraudulently inflated for a period of several months. During this time, defendants allegedly made several partially curative disclosures. These partial disclosures caused the trading price of the stock to decline gradually, instead of dropping suddenly as is usually the case when a one-time full disclosure of fraud is released. As a result, some of those purchasing stock during this period also sold some or all of their shares at prices reflecting these partial disclosures.

As will be developed here, these purchasers have very different stakes in shaping the pertinent evidence from those purchasers who held their stock until after the fraud had been fully revealed. These divergent interests, which stem primarily from the measure of damages currently in use in fraud-on-the-

market cases, may be so pervasive that the interests of the class members are not sufficiently aligned to satisfy the prerequisites of FRCP 23 and fundamental due process requirements. Accordingly, this litigation may be precluded from proceeding as a class action.

Apart from these concerns, defendants have established that this litigation can proceed only as to plaintiffs' allegations that defendants failed to disclose material information they were under a duty to disclose; any claims based on alleged affirmative misstatements by defendants cannot succeed.

### I

During 1988, Seagate Technology, Inc. ("Seagate"), the issuer of a single class of NASDAQ-quoted common stock, encountered adverse conditions in its principal line of business, the manufacture of 5¼ inch rigid disk drives for personal computers. Instead of fully disclosing "the truth concerning its financial condition and business prospects," Second Consol Amended Compl ¶ 53 at 30, plaintiffs allege that, starting with a press release on July 18, 1988, Seagate made a series of "grudging admissions of certain adverse facts—no one of which was fully curative." Pls Submission re Ending Date of Class Period, June 3, 1991, at 2. Plaintiffs claim that the dissemination of these half-truths continued until October 5, 1988, when Seagate issued a press release announcing a loss for the quarter ended September 30 and the resignation of two sales executives. Second Consol Amended Compl at 33. With each disclosure, the trading price of Seagate common stock ratcheted down, dropping from $22 per share on April 13, 1988, to about $7 per share following Seagate's October 5 press release. See *In re Seagate Technology II Securities Litigation*, 802 F.Supp. 271, 272–74 (N.D.Cal.1992).

This litigation followed. Plaintiffs contend that defendants' fraudulent nondisclosures and their "grudging" partial disclosures distorted, to varying degrees, the price of Seagate common over the period from April 13, 1988, to October 5, 1988.

On August 21, 1991, another judge, to whom this litigation was then assigned, provisionally certified a class action, but established subclasses of the security's purchasers more or less keyed to the dates of the partial disclosures. The order tersely stated:

Certification for this period is provisional and subclasses shall be certified for the period 1) April 13, 1988 to July 19, 1988; 2) July 20, 1988 to August 7, 1988; 3) August 8, 1988 to September 24, 1988; 4) September 25, 1988 to October 7, 1988.

Although the litigation has thus far proceeded pursuant to that order, the parties now disagree on the effect of the order for purposes of completing pretrial preparation and trial.[1]

The prior judge's decision provisionally to certify subclasses, rather than a single class, indicates serious misgivings about the suitability of this case for class treatment. In fact, as will be explained, *any* securities fraud case involving the slow leakage of partially curative disclosures into an active securities market creates the potential for troubling antagonisms among those purchasing the security during the relevant period. Evidently, the prior judge hoped that these conflicts could be avoided by the use of subclasses. Upon further analysis, as explained below, the court concludes that the subclassing contemplated by the prior judge is wholly inadequate to the task of resolving this problem. Instead, detailed factual analysis is necessary to determine the extent and severity of the conflicting interests, so that the court can evaluate whether due process requirements and the prerequisites of FRCP 23 are satisfied. For this purpose, the court concludes that an evidentiary hearing is warranted.

In addition to the class certification dispute, the court has before it defendants' motion for summary judgment. Defendants base their motion on three arguments. First, defendants mount a so-called "truth on the market" defense, arguing that Seagate's

stock price was not distorted by any misstatements or omissions of defendants. In support of this contention, defendants offer a statistical analysis of the trading price of Seagate common throughout the class period. Second, defendants suggest that they had no affirmative duty to disclose adverse financial information to the public any sooner than they actually did so. Third, defendants claim that they are entitled to summary judgment on the issue of scienter. In response, plaintiffs have brought a cross-motion for partial summary judgment, contending that Seagate's stock price was biased by defendants' misstatements/omissions as a matter of law.

Before discussing the conclusions the court has reached on these various issues, it is imperative to set in perspective the FRCP 23 prerequisites to class certification, the elements of a Rule 10b-5 claim, and the measure of damages currently used in securities fraud cases; this follows presently. Part II then reviews the impact of the fraud-on-the-market theory on the substantive law of Rule 10b-5. As will be shown, this theory dramatically amplified the importance of certain types of class conflicts, rendering them serious obstacles, under the requirements of FRCP 23, to class certification. Part III details two such disturbing conflicts, the "seller-purchaser" conflict and the "equity" conflict, both of which are present in the case before the court. Part IV demonstrates that these conflicts may be particularly troublesome in cases, such as the instant one, involving partial curative disclosures. Finally, Part V addresses the summary judgment motion of defendants, and the partial summary judgment motion brought by plaintiffs.

### A

The prerequisites to class certification are by this time well known. To qualify for class treatment, an action must first meet the requirements of FRCP 23(a):

One or more members of a class may sue or be sued as a representative on behalf of

---

1. Plaintiffs contend that the order certified a single plaintiff class for the period April 13, 1988, through October 7, 1988, but despite the plain language of the order did not create subclasses and, in any event, should not have done

so. Defendants, on the other hand, take the position that the August 21, 1991, order established subclasses, but somehow did not also certify a class or classes.

all if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of. the class.

In addition to satisfying the prerequisites of FRCP 23(a), the action must also meet one of the three sub-parts of FRCP 23(b). Securities fraud cases in which damages are sought, however, are almost exclusively certified under FRCP 23(b)(3). See Herbert Newberg and Alba Conte, 4 *Newberg on Class Actions* § 22.44 (McGraw–Hill, 3d ed. 1992) (hereinafter, "Newberg"). This so-called "(b)(3)" class action requires the court to find:

> [T]hat the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

█ Therefore, in order to certify a class action under FRCP 23(b)(3), six elements must be established: numerosity, commonality, typicality, adequacy of representation, predominance, and superiority. Of these six, the numerosity, commonality and predominance prerequisites are relatively straightforward and require little discussion; the remaining three, however, require some explanation. Typicality exists where:

> the [named] plaintiff's claims * * * arise from the same event or practice or course of conduct that gives rise to the claims of the other class members, and his or her

claims [are] based on the same legal theory. In these circumstances, the plaintiff will advance the interests of the class members by advancing her or his own self-interest.

Newberg, § 22.17 at 22–58 (footnotes omitted). The adequacy of representation requirement has come to encompass two inquiries: (1) whether there is an absence of antagonism between the named plaintiff and the other class members; and (2) whether the absent class members can be assured of a vigorous prosecution by the named plaintiff and his or her counsel.[2] See Newberg, § 22.24 at 22–102. Only if both questions can be answered affirmatively can the named plaintiff be deemed an "adequate representative." Finally, in determining whether a class action is the superior means of proceeding, the court is to be guided by numerous factors, including:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.[3]

FRCP 23(b)(3).

### B

The elements of a Rule 10b–5 claim are hardly as clear as the prerequisites to class certification under FRCP 23. Because the private cause of action is one *implied* from Rule 10b–5, the courts have had to define its

---

**2.** This second inquiry is guided by issues regarding the competency of class counsel, the integrity and honesty of the named plaintiff, and the financial resources the named plaintiff possesses to devote to the prosecution of the action. See generally Newberg, §§ 22.36–22.38. The issues raised by the instant case, however, more properly concern the potential for antagonism contained in the first inquiry; hence, the court directs its focus accordingly. It is also important to note that because the decision in a "(b)(3)" class action serves as res judicata even as to all absent plaintiffs who have not opted out of the class, the alignment of interests called for by

FRCP 23 also has due process underpinnings. See *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940).

**3.** Of particular importance to this court's concern about possible antagonism between class members are factors (A) and (D). Additionally, it is important to note that this list of considerations is not meant to be exclusive. Rules of Advisory Committee Notes to the 1966 amendments to the Federal Rules of Civil Procedure, 39 F.R.D. 69 (1966).

contours. See generally, Thomas Lee Hazen, 2 *The Law of Securities Regulation* § 13.2 (West, 2d ed 1990) (hereinafter, "Hazen"). Given the fact that Rule 10b–5 was intended to be an "antifraud" provision, it is not surprising that courts have often looked to the elements of common law fraud in developing the requirements of a 10b–5 claim.

■ Although Rule 10b–5 has been invoked to redress a wide variety of deleterious tactics in the trading of securities, of particular concern here is its use to remedy improper "corporate disseminations." See Hazen, § 13.7 at 117. This phrase refers to either of two things: (1) affirmative misstatements made by corporate officers or directors in information releases issued by the corporation; or (2) omissions of information which render the statements actually made in such a release misleading. In order to prevail on a Rule 10b–5 claim for an improper corporate dissemination, a plaintiff must establish, inter alia: (1) a misstatement or omission; (2) the materiality of the misstatement or omission;[4] (3) scienter on the part of those making the misstatement or omitting the information; (4) reliance by the plaintiff if a misstatement is alleged; (5) the damages suffered by the plaintiff; and (6) a causal link between the plaintiff's damages and the issuer's misstatement or omission making the latter the proximate cause of the former.[5] See generally Louis Loss and Joel Seligman, IX *Securities Regulation* Ch. 11.C.4.d (Little, Brown & Company, 3d ed. 1992) (hereinafter, "Loss").

### C

■ The heretofore widely accepted measure of damages in securities fraud litigation is the so-called out-of-pocket measure. See *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). This measure of damages looks to the plaintiff's loss as opposed to the gain of the defendant. See, e.g., *Arrington v. Merrill Lynch, Pierce, Fenner & Smith,* 651 F.2d 615, 621 (9th Cir.1981) ("the difference between the value of the consideration [plaintiff] gave and the value of the security [plaintiff] received"); *Foster v. Financial Technology, Inc.,* 517 F.2d 1068, 1071 (9th Cir.1975); Note, *Rule 10b–5 Damage Computation: Application of Financial Theory To Determine Net Economic Loss,* 51 Fordham L.Rev. 838, 838–39 (1983); Note, *The Measure of Damages Under Section 10(b) and Rule 10b–5,* 46 Md.L.Rev. 1266, 1268 (1987).

An oft-cited explanation of the method of calculating damages under the out-of-pocket rule was provided in Judge Sneed's concurring opinion in *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1341 (9th Cir.1976). Judge Sneed's analysis starts with the rather simple concept that where the fraud-on-the-market is one involving either a false positive statement or a failure to disclose a negative fact, the price of the security will remain at a level above its unbiased value until a full corrective disclosure is issued.[6] Accordingly,

---

**4.** Misstated or withheld information is considered "material" if there exists a substantial likelihood that the reasonable investor would consider the information as significantly altering the total mix of information available. *Basic, Inc. v. Levinson,* 485 U.S. 224, 229–230, 108 S.Ct. 978, 982, 99 L.Ed.2d 194 (1988).

**5.** There has been a great deal of confusion over the "causation" and "reliance" elements of a Rule 10b–5 claim. Starting from common law tort requirements, some courts and commentators have simply imported into the 10b–5 realm the two causation concepts of "cause in fact" (or "but for" causation) and "proximate cause." See Hazen, § 13.6. Some have recognized that the "reliance" element substitutes for "cause in fact," and thus requires plaintiff to establish "reliance" and "proximate cause." See generally Louis Loss and Joel Seligman, IX *Securities Regulation* Ch. 11.C.4.d (Little, Brown & Company,

3d ed. 1992) (hereinafter "Loss"). Others suggest that the "reliance" element substitutes for both "cause in fact" and "proximate cause," thus obviating any separate causation inquiry. See, e.g., *In re Control Data Corp. Securities Litigation,* 933 F.2d 616, 619 (8th Cir.1991). Although this court need not resolve the actual elements of a 10b–5 claim at this stage, the court proceeds under the analysis of Professors Loss and Seligman and presumes that "reliance" substitutes only for "cause in fact," leaving "proximate cause" as an additional element of a 10b–5 claim.

**6.** Of course, if a false negative statement is made or there is a failure to disclose a positive fact, the price will actually be deflated below the unbiased value of the security. For purposes of brevity, all analysis herein deals only with the inflated price scenario posed by the instant case. All of the discussions, formulas, and principles here dis-

Judge Sneed put forth the concepts of a "price line" and a "value line," in order to trace the degree of price inflation at various points in time. The price line is relatively easy to obtain, as it is merely a plot, over time, of the various prices at which trades in the security occurred. Obtaining the value line, however, is a much more difficult task and warrants some explanation before any detailed discussion of Judge Sneed's methodology is undertaken.

### 1

Decoding how much of the price behavior of a security is attributable to alleged market manipulation requires statistical analysis. A first step in such an analysis is the elimination of non-fraud related influences. Note, *Estimating Aggregate Damages in Class–Action Litigation Under Rule 10b–5*, 59 Fordham L.Rev. 811 (1991). These include, among others, overall conditions in the securities markets. Securities, after all, compete with other investments (e.g., real estate and commodities), and different types of securities compete among themselves (e.g., computer stocks with consumer product stocks). Overall securities market conditions are often eliminated by using a broad-based standard market index such as the Standard & Poor's 500 stock index or the Wilshire 5000 index.

Securities prices are, of course, also influenced by economic conditions in the industry in which the issuer competes. As a result, it is necessary to eliminate these economic factors through the use of industry indices. Industry indices reflect the price behavior of similar types of securities issued by publicly traded companies. Usually, industry indices need to be specially constructed because most companies do not fit neatly into a single industry category.

The next step in the analysis consists of compiling the daily returns for a period not affected by the alleged fraud and then, using a regression model, calculating correlation coefficients or betas for each index. These coefficients are used with the index values for the period of the fraud to determine the unexplained random error term or portion of

cussed may, of course, be reversed in order to obtain the equivalents for the deflated price situ-

price behavior that cannot be explained by the market or industry indices. An analysis of these residual or unexplained price changes is undertaken to determine which of these might be explained by the influence of firm-specific, but non-fraud related, information, and which might be attributed to the fraud alleged.

By separating out the fraud-related component of a security's price behavior in this fashion, it is possible to obtain the price profile the security likely would have exhibited had there been no fraud. This, by definition, is the "value line" Judge Sneed envisioned. Judge Sneed recognized that drawing the "value line" could be "difficult and complex," but, with sunny optimism about the capabilities of district judges, thought it nonetheless "practicable." *Green*, 541 F.2d at 1341.

### 2

Having constructed the price line and the value line for the appropriate period, Judge Sneed's analysis proceeds as follows. First, Judge Sneed recognized that there are potentially two types of plaintiffs—those who suffered "retention" damages and those who suffered "in/out" damages. Retention damages arise where a plaintiff purchased securities during the period of inflation, and then held the securities throughout the remainder of the class period. In/out damages, on the other hand, arise where the plaintiff purchases a number of securities during the price inflation, but then also sells all of those securities before the end of the class period. It is even possible for a single plaintiff to have both types of damages, provided he purchased a certain number of securities during the class period and sold a smaller number before the end of the period.

Judge Sneed's description of the method for calculating an individual plaintiff's damages, whether retention or in/out damages, can be conveniently represented in the following mathematical form:

$$D = P * (PL_p - VL_p) - S * (PL_s - VL_s),$$

ation.

where D represents damages to the individual; P represents the number of securities purchased in the class period; $PL_p$ represents the price read from the price line at the time of purchase; $VL_p$ represents the value taken from the value line at the time of purchase; S represents the number of securities sold in the period, with the added condition that the maximum value of S is equal to P; $PL_s$ and $VL_s$ represent, respectively, the amounts taken from the price line and value line at the point of sale. In this formula, the first product $[P * (PL_p - VL_p)]$ represents the loss to the plaintiff caused by the fraudulent price inflation—i.e., the "extra" amount plaintiff was forced to pay in purchasing his securities. The second product $[S * (PL_s - VL_s)]$, on the other hand, represents the amount by which plaintiff benefited from the fraud if and when he sold his shares.[7]

The determination of retention damages is relatively straightforward. The retention plaintiff is injured when required to pay an inflated price for the securities at the date of purchase. Since the retention plaintiff never *sells* any securities, he never benefits from the fraudulently inflated price in any manner. Hence, his damages are simply the difference, at the time of purchase, between the price line and the value line, multiplied by the number of securities bought.[8] Turning to the above formula, since the retention plaintiff has not sold any shares in the period, $S = 0$. Therefore, the second term drops out, and the purchaser's damages are wholly captured by the first term, i.e., $P * (PL_p - VL_p)$.

In/out damages require a slightly more elaborate discussion. Assuming for the moment that the in/out plaintiff sold, in the class period, securities equal in number to those he purchased in the period, the analysis is as follows. Just as the retention plaintiff, the in/out plaintiff is injured when forced to pay an inflated price at the time of purchase. Unlike the retention plaintiff, however, the in/out plaintiff recoups at least some (perhaps all) of his loss when he *sells* at the inflated price. Thus, in awarding him damages, it is only fair to subtract from his injury upon purchase the amount of his recoupment upon sale. In other words, the plaintiff's profits from reselling are deducted from his losses.

If the plaintiff resells all the securities purchased during the period, then in the above formula $P = S$, and the formula reduces to:

$$D = P * [(PL_p - VL_p) - (PL_s - VL_s)]$$

The first product generated by the foregoing formula represents the injury the in/out plaintiff suffered when he purchased the securities (P), while the second product is the recoupment he enjoyed upon selling those securities. From this it is clear that if the degree of price inflation upon sale $(PL_s - VL_s)$ is equal to the price inflation at purchase $(PL_p - VL_p)$, then the two terms cancel out, leaving $D = 0$. If the inflation upon sale is *greater than* the inflation at purchase [i.e., $(PL_s - VL_s) > (PL_p - VL_p)$], then the second product is greater than the first, leaving D negative ($D < 0$). This, of course, means that as a result of the fraud, the trader has actually "recouped" more upon

---

7. This formula applies where only one purchase is made in the period and one or no sales are made in the period. If more than one purchase, or more than one sale, is made in the period, the formula would need to be modified slightly. Basically, one would need to multiply the number of shares purchased in transaction t by the price inflation existing at the time of that transaction; then by summing these products over all transactions, one can arrive at the total loss to the plaintiff caused by the fraud-induced price inflation. A similar calculation can be performed for multiple sales in order to determine the total benefit the plaintiff derived due to the fraud. Subtracting the latter sum from the former yields that plaintiff's damages.

8. As an initial step in calculating *aggregate* class damages, the number of securities purchased must be determined. This can be done in either of two ways: (1) collecting proofs of claims by persons trading in the security during the class period; or (2) estimating the volume of trading by using aggregate trading data. Method (1) can be costly and time-consuming, while method (2) requires use of assumptions that may not be correct. Because of the cost factor, estimation is usually employed. See 59 Fordham L.Rev. at 827 et seq. Estimating the number of shares which trade and thus are affected by the fraud-on-the-market is a complex endeavor, primarily because of intermediate trading (between broker-dealers) and the unavailability of trading records for the class members. Id. at 841.

sale than he lost upon purchase; thus, he is entitled to no relief. Legally cognizable damages exist only if the degree of inflation upon sale is *less than* that existing at purchase—i.e., if $(PL_s - VL_s) < (PL_p - VL_p)$. Furthermore, the damage recovery will be maximized the greater the disparity between the inflation at sale and the inflation at purchase.

Finally, if the plaintiff is one who has suffered both in/out damages and retention damages, the same formula may be used. Mathematically, the "combination" plaintiff poses the situation in which the number of shares purchased in the period exceeds the number sold in the period, i.e., $P > S$. Therefore, the existence and amount of damages will depend on the relative magnitudes of the purchases, sales, and amounts of fraudulent price inflation prevailing at the corresponding dates.[9]

## II

The use of the class action device has long been the favored approach of courts faced with a Rule 10b–5 action in which numerous traders have allegedly been injured. Apart from the usual advantages in judicial economy conferred by the class action, the securities field has been characterized as "particularly well suited for representative litigation under [FRCP] 23." Newberg, § 22.10 at 22–5.

Two strong sentiments seem to underlie a great many class certification decisions. First, because the damages suffered by any one securities action plaintiff are often too small to justify litigation, the class action affords a large number of plaintiffs with relatively small claims a chance to obtain redress through aggregation. Second, the class action device is viewed as a necessary and desirable supplement to the enforcement efforts of the Securities and Exchange Commission. Thus, courts have concluded that in securities cases, "any doubts should be resolved in favor of allowing a class action," [10] that the court "should err in favor of allowing the class to go forward," [11] and that "the requirements of Rule 23 should be liberally construed in favor of class actions." [12]

These strong sentiments may have precipitated, at least in part, the advent of the fraud-on-the-market theory of liability. As developed below, this theory eased satisfaction of the "predominance" prerequisite of FRCP 23, thus apparently making the class action device more readily available in securities fraud cases. At the same time, however, adoption of the theory had another effect that was surely unintended and has yet to be acknowledged: certain forms of class conflicts have taken on a central role in the class certification process. In order to appreciate fully the impact of the fraud-on-the-market theory, it is instructive to compare class certification decisions made before the theory with those made afterwards.

## A

Prior to the *Basic* plurality's adoption of the fraud-on-the-market theory, a plaintiff, in order to state a valid Rule 10b–5 "corporate dissemination" claim, had to establish each of the six requirements discussed above—i.e., a misstatement or omission, materiality, scienter, reliance, damages, and proximate causa-

9. There is an important implication in using the same formula to determine the recovery for a "combination" plaintiff. Since the second product of the equation represents recoupment upon sale, the combination plaintiff may actually have his retention damages reduced, in part or in whole, by the recoupment he obtained when he sold his in/out portion. A simple example illustrates the point. Suppose 10 shares are purchased at a time when the price inflation is $10 per share. Next, assume 5 shares are later sold at $20 inflation, while the remaining 5 shares are held throughout the class period. The formula determines his damages to be $(10 * \$10) - (5 * \$20) = 0$. In words, his sale of the 5 shares allowed him to recoup not only the amount he lost upon purchasing those 5 shares, but also the amount lost when he purchased the 5 shares he was still holding at the end of the class period. The cases, to date, do not appear to have addressed the propriety of such an offset.

10. *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 122 F.R.D. 177, 179 (E.D.Pa.1988).

11. *In re Bexar County Health Facility Development Corp. Securities Litigation,* 125 F.R.D. 625, 628 (E.D.Pa.1989).

12. *In re United Energy Corp. Solar Power Modules Tax Shelter Investments Securities Litigation,* 122 F.R.D. 251, 253 (C.D.Cal.1988).

tion. A court contemplating class certification in such a case, of course, had to ensure that the six prerequisites of a "(b)(3)" class action were satisfied—i.e., numerosity, commonality, typicality, adequacy of representation, predominance, and superiority.

In corporate dissemination securities fraud cases involving shareholders or traders in a publicly traded or listed security, the numerosity requirement of FRCP 23 was almost always satisfied. Newberg, § 22.09 at 22–20. In addition to the fact that such cases often involved large numbers of potential plaintiffs, id., these plaintiffs were often geographically widely dispersed. Id. at 22–28. Because both of these factors tended to make joinder impracticable, defendants rarely contested class certification on numerosity grounds. Id. at 22–20.

Likewise, the commonality requirement did not pose a significant obstacle to class certification; plaintiffs could ordinarily point to a number of questions of law and fact that would be common to their individual suits. The first element of a 10b–5 claim, the existence of a misstatement or omission, obviously posed numerous common factual inquiries concerning the knowledge and actions of the defendants. Additionally, the materiality inquiry necessitated by a 10b–5 claim always posed a "common question"—i.e., whether there was a substantial likelihood that a reasonable investor would consider the information significant in the total mix of information. See *Basic*, 485 U.S. at 231–232, 108 S.Ct. at 983. Finally, the third element of a 10b–5 claim, scienter, also constituted a common question, since the relevant inquiry was into the intent of the defendants. Therefore, three of the six elements of a 10b–5 claim—i.e., misstatement/omission, materiality, and scienter—posed common questions.[13]

The typicality requirement of FRCP 23 was also generally satisfied without great difficulty.[14] Where a number of plaintiffs sought recovery based on a single misstatement or omission, typicality was easily satisfied since all claims arose "from the same event," and were "based on the same legal theory." See Newberg, § 22.17 at 22–58. Similarly, where the plaintiffs alleged a series of misstatements or omissions which arguably constituted a scheme to defraud, or a "course of conduct," typicality was also met. Id. In essence, if the elements which the named plaintiff had to prove to prevail were substantially similar to those elements which the class members had to establish, typicality was satisfied. Id. at 22–86.

The sixth element[15] to FRCP 23(b)(3) class certification is a finding of superiority. This requirement, in the context of Rule 10b–5 corporate dissemination cases, often possessed little independent content. In some cases, the courts stated that a class action was superior to individual actions due to the fact that small-claim plaintiffs may not be able to sue individually. See, e.g., *Simon v. Westinghouse Electric Corp.*, 73 F.R.D. 480, 487 (E.D.Pa.1977); *Herbst v. Able*, 47 F.R.D. 11, 17 (S.D.N.Y.1969); *Feldman v. Lifton*, 64 F.R.D. 539, 549 (S.D.N.Y.1974). In other cases, the court addressed the manageability inquiry specified by FRCP 23(b)(3)(D), see supra, by suggesting that class conflicts could be made manageable through the use of subclasses. See, e.g., *Simon*, 73 F.R.D. at 487; *Koenig v. Smith*, 88 F.R.D. 604, 610 (E.D.N.Y.1980); *Jenson v. Continental Financial Corp.*, 404 F.Supp. 806, 814 (D.Minn. 1975). In still others, courts have referred to general notions of judicial economy as supporting the superiority of proceeding by class action. See, e.g., *Herbst v. Able*, 47 F.R.D. at 17; *Jenson*, 404 F.Supp. at 814. Given that the courts, in discussing the superiority

13. The remaining three elements (reliance, damages, and proximate causation) posed questions that would need to be addressed by each plaintiff individually. The balance between these individual questions and the common questions is the inquiry called for by the "predominance" requirement, discussed below. See infra pp. 1351–53.

14. Some courts have included in the typicality prerequisite the inquiry into antagonism among

class members. See Newberg, § 22.17 at 22–64 (and authorities cited therein). But as Professor Newberg has noted, "[t]he alignment of interest is not the test for typicality; it is the result." Id. at 22–59. Therefore, the court chooses to follow Professor Newberg's approach of dealing with antagonism under the "adequacy of representation" element.

15. In order to ease the discussion, the FRCP 23 prerequisites are taken up slightly out of order.

requirement, often merely reiterated points made in considering other FRCP 23 requirements, it is not surprising that the superiority element of FRCP 23(b)(3) rarely precluded class certification.

The only significant hurdles to class certification in the era before the fraud-on-the-market theory were provided by the remaining two prerequisites of FRCP 23—predominance and adequacy of representation.

1

In considering the predominance requirement of FRCP 23, courts sometimes had difficulty. As mentioned above, three of the six Rule 10b–5 elements (misstatement/omission, materiality, and scienter) provided common questions of law and/or fact, thus satisfying the commonality requirement. Prior to the adoption of the fraud-on-the-market theory, the remaining three Rule 10b–5 elements—reliance, damages, and proximate cause—all constituted *individual* questions of law and/or fact. Each plaintiff had to show that he personally relied on the particular misstatement at issue.[16] Similarly, each plaintiff had to establish the existence and amount of his own damages and prove that these damages were proximately caused by the defendants' misstatement/omission.[17] The relevant inquiry was thus whether the three common questions "predominated" over the three individual ones.

The specter of individual determinations of reliance and/or damages, for a large plaintiff class, rightly gave the courts serious cause for concern about whether the common questions could predominate. Nonetheless, due perhaps to the sentiment for "liberal" application of FRCP 23 in the securities fraud context, see supra p. 1350, courts routinely found the predominance requirement satisfied *despite* the presence of extensive individual issues. See, e.g., *Koenig*, 88 F.R.D. at

607; *Simon*, 73 F.R.D. at 486; *Jenson*, 404 F.Supp. at 814; *Herbst v. International Telephone & Telegraph*, 495 F.2d 1308, 1321 (2d Cir.1974); *Feldman*, 64 F.R.D. at 548; *Herbst v. Able*, 47 F.R.D. at 16. As stated by the Second Circuit, in an often-cited passage:

> [defendant] earnestly argues that each person injured must show that he personally relied on the misrepresentation in order to recover and thus any common issues of misrepresentations do not predominate over the individual questions of reliance. Even if [defendant] is correct in its assertion of the need for proof of reliance * * * we must still reject the argument. Carried to its logical end, it would negate any attempted class action under Rule 10b–5, since as the District Courts have recognized, reliance is an issue lurking in every 10b–5 action. * * * We see no sound reason why the trial court, if it determines individual reliance is an essential element of the proof, cannot order separate trials on that particular issue, as on the question of damages, if necessary. The effective administration of 23(b)(3) will often require the use of the "sensible device" of split trials.

*Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir.1968).

As exemplified by this passage, the conclusions of various courts that common questions predominated over individual ones suffered from two fundamental flaws. First, these holdings, instead of being based on actual comparisons of the relative weights of the common questions and the individual questions, were driven primarily by vague policy considerations. Thus, it appears that the courts may have certified classes in situations where the individual issues actually equalled or outweighed the common questions. The second flaw in these holdings is that the

---

**16.** After the Supreme Court's landmark decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), a plaintiff bringing a 10b–5 omissions case (as opposed to a misstatement case) need not affirmatively prove reliance; instead, reliance is presumed.

**17.** Apparently due to the confusion about the interplay between the reliance and causation ele-

ments of a Rule 10b–5 claim, see supra note 5, most courts focused only on the individual questions posed by the reliance and damages elements, omitting consideration of the individual questions raised by the proximate cause requirement. At least one court, however, *did* recognize that individual questions of causation may be raised. *Jenson*, 404 F.Supp. at 814.

"solution" of using separate or split trials on the individual questions is illusory. As one court noted:

> [u]se of the bifurcation method * * * does not resolve what appears to be an inherent conflict between proof of the reliance element of a 10b–5 action and the "predominance of common issues" requirement of Rule 23(b)(3); it merely delays resolution of the problem until a later date. * * * That is, if actual individual reliance in its common law sense need be proved by each class member, the trial of that issue, even at a later stage in the proceedings, would tax the court's (and counsels') resources to an intolerable extent. Accordingly, the court is constrained to deal with the reliance enigma at the outset in making its determination of whether a class should be certified.

*Grad v. Memorex, Inc.*, 61 F.R.D. 88, 98 (N.D.Cal.1973).

Nonetheless, the predominance requirement of FRCP 23(b)(3), though giving the courts some grounds for concern, failed to prevent class certification. Relying on the possibility of split trials, the courts appeared satisfied that the predominance requirement was met, and they regularly certified plaintiff classes.

### 2

The final requirement of FRCP 23, adequacy of representation, also minimally troubled the courts. As detailed above, one of the functions of this requirement is to ensure that there are no conflicts among members of the plaintiff class. In the 10b–5 corporate dissemination cases arising before the fraud-on-the-market theory, class members were most likely to have conflicting interests in establishing the "damages" element.[18]

As might have been expected, the defendants in these cases often attempted to prevent class certification by alerting the court to this antagonism. See, e.g., *Koenig v. Smith*, 88 F.R.D. 604 (E.D.N.Y.1980); *Simon v. Westinghouse Electric Corp.*, 73 F.R.D. 480 (E.D.Pa.1977); *Jenson v. Continental Financial Corp.*, 404 F.Supp. 806 (D.Minn. 1975); *Feldman v. Lifton*, 64 F.R.D. 539 (S.D.N.Y.1974); *Madonick v. Denison Mines Ltd.*, 63 F.R.D. 657 (S.D.N.Y.1974); *B & B Investment Club v. Kleinert's, Inc.*, 62 F.R.D. 140 (E.D.Pa.1974); *Herbst v. Able*, 47 F.R.D. 11 (S.D.N.Y.1969).[19] When presented with such arguments, however, the courts were generally unmoved. Given the plaintiffs' *common* interest over the more immediate liability question, any conflict arising merely over damages, the courts reasoned, could not defeat class certification. As one court put it:

> [the] conflicts * * * relate only to damages and thus are peripheral to the central issues in this case. Such conflicts potentially are presented in every securities fraud case involving a prolonged class period, but have been rejected consistently by the courts as grounds for denying class certification.

*Simon*, 73 F.R.D. at 484 (citations omitted). Similarly, the court in *B & B Investment Club* responded to an assertion of antagonism by stating:

> Initially, the primary issue will not be the amount of damages but rather whether there is any liability on the part of defendants at all and any future conflicts can be handled by the formation of subclasses or further delineation of the class.

*B & B Investment Club*, 62 F.R.D. at 144 (citations omitted). This latter suggestion of using subclasses at a later date to handle "future conflicts" over damages was made quite often by the courts, usually en route to a decision to certify a plaintiff class.[20] See,

---

**18.** The precise reason for this phenomenon, and the various types of conflicts encountered, are explored and developed below. See infra part III.

**19.** Some of these cases handle the issue of antagonism between plaintiff class members under the "typicality" requirement of FRCP 23(a). See, e.g., *Simon*, 73 F.R.D. at 484; *B & B Investment*, 62 F.R.D. at 144. As mentioned above, the court

is of the opinion that antagonism between class members is more properly addressed under the "adequacy of representation" element of FRCP 23, and hence these cases are discussed here. See supra note 14.

**20.** As discussed below, subclasses *cannot* realistically be used to address the types of conflicts which arise in Rule 10b–5 corporate dissemination cases. See infra parts III.A, III.B.

e.g., *Koenig,* 88 F.R.D. at 609; *Jenson,* 404 F.Supp. at 811 n. 5; *Feldman,* 64 F.R.D. at 549; *Madonick,* 63 F.R.D. at 659; *Herbst,* 47 F.R.D. at 15.

Quite apart from the feasibility of using subclasses, the important point is that the courts established that they were generally unwilling, at the class certification stage, to deal with conflicts arising over the proof and calculation of damages. The *only* way that antagonism over damages could possibly preclude certification, a number of courts held, was if the conflict went "to the heart of the controversy." *Koenig,* 88 F.R.D. at 608 (quoting *Gates v. Dalton,* 67 F.R.D. 621, 630 (E.D.N.Y.1975)). See also *Jenson,* 404 F.Supp. at 811 (to prevent class certification, a conflict must go to "the very subject matter of the litigation"). Such conflicts, however, were rarely perceived. But see *Wood v. Rex–Noreco, Inc.,* 61 F.R.D. 669 (S.D.N.Y. 1973) (conflict as to damages was serious enough to preclude certification); *Ruggiero v. American Bioculture, Inc.,* 56 F.R.D. 93 (S.D.N.Y.1972) (damages conflict enough to prevent class certification).

It appears, therefore, that although conflicts were often alleged to exist among plaintiff class members over the "damages" element of a Rule 10b–5 claim, the courts were not impeded in certifying a plaintiff class. Instead, the courts merely deferred serious consideration of these conflicts to a later stage in the proceedings, casually mentioning the use of subclasses as a possible solution to deal with this otherwise "peripheral" issue.

### B

■ The fraud-on-the-market theory of liability received its first judicial endorsement as early as 1975, in the case of *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975). This theory, as discussed further below, essentially raises a presumption of reliance in Rule 10b–5 corporate dissemination cases involving securities traded in efficient markets. In short, a plaintiff seeking Rule 10b–5 recovery under such circumstances need not prove that he personally relied on the misstatement or omission. In the years between 1975 and 1988, seven of the remaining ten circuits followed the *Blackie* court in adopting, in one

form or another, the fraud-on-the-market theory; during the same period, no circuit explicitly rejected it. Loss, Ch. 11:C.4.d at 4396 n. 460.

### 1

In 1988, the fraud-on-the-market theory received the approval of a plurality of the Supreme Court in *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In addition to the usual import which attends the affirmation of a new theory by the Supreme Court, the holding of *Basic* had great significance for at least two other reasons. First, the plurality's opinion provided a coherent and cogent explanation of the foundations which make the fraud-on-the-market doctrine an acceptable basis for Rule 10b–5 liability. Second, the holding established a uniform fraud-on-the-market theory to replace the numerous versions previously in use in the various circuits. Because the *Basic* plurality's explication of the fraud-on-the-market doctrine is now the controlling authority, only that version of the theory is reviewed here.

In *Basic,* the plurality laid down a rule of legal liability for misstatements made impersonally by issuers of securities, and related parties, in connection with the active trading of the issuer's securities. This rule draws its intellectual sustenance not from law, but from the efficient capital market hypothesis, a theory of financial economics which posits that information regarding a company's expected future value is quickly and accurately incorporated into the price at which the company's securities actively trade on an open and well-developed market. See Jonathan R. Macey and Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory,* 42 Stan.L.Rev. 1059, 1076–83 (1990); Ronald J. Gilson and Reinier H. Kraakman, *The Mechanisms of Market Efficiency,* 70 Va.L.Rev. 549, 561 (1984).

The essence of the fraud-on-the-market theory of liability is that a plaintiff seeking to recover under Rule 10b–5 for an improper corporate dissemination need not prove his own personal reliance on the particular misrepresentation; instead, reliance is to be pre-

sumed. *Basic,* 485 U.S. at 247, 108 S.Ct. at 991–92. This conclusion was arrived at by the *Basic* plurality through a three-step analysis. First, the efficient capital market hypothesis allows a court to assume that any material misrepresentation made by an issuer of securities will quickly and accurately be reflected in the market price of that issuer's securities, so long as the market involved is an "efficient" one. Id. at 244, 108 S.Ct. at 290. Next, it is presumed reasonable for an investor to rely on the integrity of the market price of any such security. Id. at 246–47, 108 S.Ct. at 291–92. And finally, because an investor who trades in a particular security can be presumed to have done so based on the market price of that security, if that market price reflects some misrepresentation made by the issuer of the security, the trader can be deemed to have relied on the misrepresentation itself. Id. at 247, 108 S.Ct. at 991–92. As summarized by the Ninth Circuit in *In re Convergent Technologies Securities Litigation,* 948 F.2d 507, 512 n. 2 (9th Cir.1991), "[a]n investor's reliance on the market * * * is equivalent to reliance on statements made to the market or to nondisclosures of material information."

The *Basic* plurality characterized this presumption of reliance as "rebuttable" by a showing that the misrepresentation did not distort the price of the security, "or [that] an individual plaintiff traded or would have traded despite his knowing" of the misrepresentation. *Basic,* 485 U.S. at 248, 108 S.Ct. at 992. To some extent, however, this is misleading.

The first of these methods, a showing of a lack of price distortion, does not directly "rebut" the reliance presumption as much as it attacks the foundational prerequisites to application of the fraud-on-the-market theory. Provided that a plaintiff can establish the materiality of the misinformation, such proof merely establishes that the market is not an "efficient" one which transmits material information via the pricing mechanism; since the fraud-on-the-market theory only applies to efficient markets, a presumption of reliance is therefore inappropriate. To the extent the market *is* an efficient one, howeverer, the presumption of reliance cannot be rebutted by this first technique.

The second manner in which the presumption of reliance may allegedly be rebutted, through proof that the plaintiff would have traded in the security despite knowledge of the misrepresentation, was recognized by the dissenters in *Basic* to be "virtually impossible in all but the most extraordinary ·case." *Basic,* 485 U.S. at 256 n. 7, 108 S.Ct. at 996 n. 7 (White, J., dissenting). The reason for this skepticism, as articulated by the Ninth Circuit when it first adopted the fraud-on-the-market theory in *Blackie v. Barrack,* 524 F.2d 891, 906 n. 22 (9th Cir.1975), is that it is "doubt[ful] that a defendant would be able to prove in many instances to a jury's satisfaction that a plaintiff was indifferent to a material fraud." See also *In re LTV Securities Litigation,* 88 F.R.D. 134, 143 n. 4 (N.D.Tex. 1980) (suggesting that if a fraud-on-the-market theory were adopted, any attempt to rebut a presumption of reliance "would likely be futile in the vast number of cases"). Therefore, for securities trading in an efficient market, the *Basic* plurality's holding created, for all practical purposes, "a *nonrebuttable* presumption of reliance in future Rule 10b–5 cases." *Basic,* 485 U.S. at 256 n. 7, 108 S.Ct. at 994 n. 7 (White, J., dissenting) (emphasis added).

2

As should be evident from the foregoing discussion, the adoption of the fraud-on-the-market theory, and its concomitant presumption of reliance, · represented an important alteration in the procedures by which Rule 10b–5 corporate dissemination cases were formerly litigated.[21] An examination of class certification decisions under the theory highlights the pertinent changes.[22]

---

**21.** As discussed above, by the time *Basic* was decided, eight circuits had already adopted the fraud-on-the-market theory. Although the specifics of the theory may have differed among the circuits, the presumption of reliance was a factor common to all. Therefore, this modification to Rule 10b–5 had. actually occurred in most circuits well before 1988.

**22.** In order to review how courts have responded to the adoption of the fraud-on-the-market theory, of course, it is necessary to look not only at those cases arising after the date of *Basic;* also

The analysis of the numerosity requirement changed only slightly under the fraud-on-the-market theory. By substituting a presumption of reliance for proof by each plaintiff of actual individual reliance, the theory actually increased the number of investors who could claim injury. Under the theory, even those who never heard the alleged misstatement can recover therefor, whereas such persons would otherwise be unable to recover for lack of reliance. Thus, satisfaction of the numerosity requirement has been made even easier by the fraud-on-the-market theory.

The finding of typicality necessitated by FRCP 23(a) also remained unchanged by the fraud-on-the-market theory. As detailed above, an allegation of a "course of conduct" on the part of the defendants previously sufficed to ensure that the named plaintiff's claims were "typical" of those of the class. See supra, p. 1351. Under the fraud-on-the-market theory, plaintiffs' ability to allege a course of conduct remains unchanged; thus typicality is still easily established. See, e.g., *In re Unioil Securities Litigation*, 107 F.R.D. 615, 620 (C.D.Cal.1985); *Seidman v. Stauffer Chemical Corp.*, [1986–1987] Fed. Sec.L.Rep. (CCH) ¶ 92,868 at 94,233, 1986 WL 9803 (D.Conn. Jan. 17, 1986); *Greene v. Emersons Ltd.*, 86 F.R.D. 47, 58 (S.D.N.Y. 1980); *Tucker v. Arthur Andersen & Co.*, 67 F.R.D. 468, 483 (S.D.N.Y.1975); see, generally, *In re AM International, Inc. Securities Litigation*, 108 F.R.D. 190 (S.D.N.Y.1985); *In re LTV Securities Litigation*, 88 F.R.D. 134 (N.D.Tex.1980). Similarly, the superiority requirement, previously possessing little independent content, see supra pp. 1351–1352, still remains flexible enough so as to ensure that class certification will not be precluded on this ground.

Instead, the most pronounced effects of the fraud-on-the-market theory occurred with respect to the commonality and predominance prerequisites on the one hand, and the adequacy of representation requirement on the other.

appropriate are those cases arising after the rele-

a

The commonality and predominance prerequisites were dramatically altered by the fraud-on-the-market theory. As discussed above, the three Rule 10b–5 elements of misstatement/omission, materiality, and scienter formerly provided the common questions of law or fact, while the remaining three elements—reliance, damages, and proximate causation—constituted individual questions. See supra p. 1351. Despite serious concerns, courts regularly found that the three common questions predominated over the three individual ones. See supra pp. 1351–53. To understand how the fraud-on-the-market theory altered this state of affairs, it is necessary to examine more closely the implications of the theory.

The most visible effect brought on by the fraud-on-the-market theory has to do, of course, with the "reliance" element of Rule 10b–5. Under pre-existing law, each plaintiff had to prove his own personal reliance on the misrepresentation, thus making this an individual issue. See supra pp. 1351–52. The fraud-on-the-market theory, however, allows a presumption of reliance for all plaintiffs, provided that a material misrepresentation/omission is transmitted through an efficient market via the pricing mechanism. See supra pp. 1354–55. It should be apparent, then, that the fraud-on-the-market theory caused the "reliance" element to "cross-over" from being an individual question to becoming a common question.

This shift in the balance between common and individual questions did not go unnoticed by the courts. See, e.g., *Basic*, 485 U.S. at 242, 108 S.Ct. at 989; *Seidman*, [1986–1987] Fed.Sec.L.Rep. at 94,232; *In re LTV Securities Litigation*, 88 F.R.D. at 134; *Tucker*, 67 F.R.D. at 480. In fact, the adoption of the fraud-on-the-market theory appears to have been motivated, at least in part, precisely by a desire to tip this balance in favor of the common questions. For instance, the plurality in *Basic* noted:

[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented

vant circuit adopted the theory.

respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones. The District Court found that the presumption of reliance created by the fraud-on-the-market theory provided "a practical resolution to the problem of balancing the substantive requirement of proof of reliance in securities cases against the procedural requisites of [FRCP] 23." The District Court thus concluded that * * * common questions predominated over individual questions * * *.

*Basic*, 485 U.S. at 242, 108 S.Ct. at 989. Similarly, the district court in *In re LTV Securities Litigation*, in adopting the fraud-on-the-market theory, observed:

If we are [faced] with 100,000 trials of questions of reliance, it becomes obvious that there is no predomination * * * If we add as a common issue the questions of fraud on the market and the [degree of price inflation] there is an immediate flip in result. These common issues would predominate and the class would be manageable (if with great effort).

*In re LTV Securities Litigation*, 88 F.R.D. at 141–142.

The impact of the fraud-on-the-market theory, however, did not stop with the transformation of the "reliance" element. An analysis of the *manner* in which the presumption of reliance was justified reveals the other effects brought on by the adoption of the theory. Central to the fraud-on-the-market theory is the efficient capital market hypothesis, which posits that all misinformation introduced into an efficient market is transmitted via the pricing mechanism. In particular, the making of a false positive statement or the omission of a negative fact will result in a market price which is artificially inflated above that level which would otherwise prevail; conversely, a false negative statement or an omission of a positive fact will cause artificial price deflation.[23]

Under the fraud-on-the-market theory, this concept of "price inflation" is the linchpin of the plaintiffs' Rule 10b–5 corporate dissemination case. First, the presumption of reliance itself assumes that the price of the relevant security has transmitted the misrepresentation; in other words, the price on which the investor relied must have been artificially inflated as a result of the misstatement/omission. See supra pp. 1354–1355. Next, under the out-of-pocket measure of damages, a plaintiff who purchases stock suffers damages *only if* there is some degree of misrepresentation-induced price inflation at the time of purchase. See supra part I.C.2. Third, the "proximate cause" element is also substantially aided by proof of price inflation. Because the plaintiff's damages flow directly from any existing price inflation, if a causal link can be shown between the misstatement/omission and the price inflation, the plaintiff's damages can be deemed to have been "proximately caused" by the defendants' acts. In other words, price inflation serves as an intermediary, linking damages to the misrepresentation. Finally, the existence of price inflation traceable to the defendants' misrepresentation is evidence of the "materiality" of that misstatement/omission; only information which a reasonable investor would consider significant would have an inflationary impact on the price of a security.

This somewhat circular demonstration confirms the fact that the proof of price inflation plays a central role in establishing liability in Rule 10b–5 corporate dissemination cases. As summarized by one commentator:

[a]cceptance of the logic of the fraud on the market theory * * * leads to the conclusion that there is no need in a securities fraud case for separate inquiries into materiality, reliance, causation, and damages. These inquiries are necessary in a face-to-face transaction where each party must make a subjective valuation of information provided by the other party, but irrelevant in open market transactions where the market price transmits all relevant information. The relevant inquiry in open market transactions should be whether the

---

**23.** All of these results depend on the assumption that the information misstated or withheld is "material." See supra note 4. Since the instant case involves allegations of the omission of nega-

tive facts, and in order to simplify the discussion, the court proceeds with an analysis of price inflation and omits consideration of price deflation.

market price was in fact artificially affected by false information.

Daniel R. Fischel, Use of Modern Finance Theory in Securities Fraud Cases, 38 Bus. Law 1, 13 (1982). Viewed in this light, the implications of the fraud-on-the-market theory are quite far-reaching. Because proof of the existence of a misstatement or omission, scienter, and price inflation all constitute questions of law and fact common to the class, virtually no individual questions remain,[24] and the predominance prerequisite is easily satisfied.

b

The fraud-on-the-market theory has also had a significant effect on the adequacy of representation element of FRCP 23. While the theory simplified matters on the predominance front, it gravely complicated matters on the issue of adequacy of representation. Particularly, certain types of class conflicts have taken on much greater significance under the theory.

To appreciate this fact, it is only necessary to recall the central role which price inflation plays under the fraud-on-the-market theory. See supra p. 1357. Therefore, to the extent class members have conflicting interests in establishing the existence and/or amount of price inflation, such a dispute infests four of the six Rule 10b–5 elements; only the "misstatement/omission" and "scienter" elements are unaffected. And as discussed below, conflicts over price inflation are likely to arise in the great majority of corporate dissemination cases.[25]

The courts, however, have largely focused solely on the connection between price inflation and the "damages" element, thus ignoring the nexus between price inflation and the reliance, materiality, and proximate cause requirements. A typical example of this approach was provided by the Ninth Circuit in the early fraud-on-the-market decision in *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975). The court first noted that while some class members would desire to maximize the degree of price inflation, others would seek to minimize it. Id. at 908. The court continued by observing:

> courts have generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit. * * * Here, the conflict, if any, is peripheral, and substantially outweighed by the class members' common interests.

Id. at 909. In other words, a dispute over the existence or amount of price inflation was considered to be one simply over "damages;" and, just as courts had done before the fraud-on-the-market theory, the *Blackie* court did not consider conflicts "merely" over damages to be sufficient to defeat class certification unless they were at the "very heart of the suit." [26]

The problem with this analysis, of course, is that antagonism over price inflation *cannot* be equated solely with a difference in interests over the "damages" element; instead, it implicates the reliance, materiality, and proximate cause elements as well. So viewed, it is apparent that a conflict over price inflation *is* at the "heart of the suit," and can hardly be called "peripheral." Furthermore, consideration of a dispute over price inflation cannot be deferred until a later stage in the proceedings, because such a dispute presents not only an *eventual* problem with the damages element, but also an *immediate* problem

---

**24.** The only individual question remaining appears to be the calculation of each plaintiff's damages.

**25.** Two specific examples of such conflicts over price inflation are discussed below. See infra parts III.A, III.B.

**26.** Unfortunately, the approach of the *Blackie* court was not tempered with time or experience. Courts continued to discuss a conflict over price inflation simply as a dispute as to the "damages" element; see, e.g., *Tucker*, 67 F.R.D. at 482; *In re*

*LTV Securities Litigation*, 88 F.R.D. at 149; *Greene*, 86 F.R.D. at 61; *In re Unioil Securities Litigation*, 107 F.R.D. at 622; *In re AM International, Inc. Securities Litigation*, 108 F.R.D. at 196; *Seidman*, [1986–1987] Fed.Sec.L.Rep. at 94,233; thus, these courts did not consider a conflict over price inflation to be at the "heart of the suit." See, e.g., *In re Unioil Securities Litigation*, 107 F.R.D. at 622; *In re AM International, Inc. Securities Litigation*, 108 F.R.D. at 196; *Seidman*, [1986–1987] Fed.Sec.L.Rep. at 94,232.

with proof of the reliance, materiality, and proximate cause elements.

Driven perhaps by an overarching desire to effectuate the securities laws and provide relief for small-claim plaintiffs, the courts have failed to address the importance that the fraud-on-the-market theory gives to class conflicts over price inflation. These conflicts are not only serious, but they are pervasive enough to threaten to preclude satisfaction of the adequacy of representation element of FRCP 23.

### III

In proving the existence and amount of price inflation,[27] two specific forms of conflict may appear in the plaintiff class. First, there is likely to arise a conflict between those in/out traders who sold securities on a particular day, and those plaintiffs who purchased on that same day. Second, there may be conflicting interests between those persons who still hold some of the relevant securities on the date of suit, and those who have divested themselves of all such holdings. And as a variant of this latter conflict, antagonism may even surface amongst those holding securities on the date of suit. These are taken up in turn, and the efficacy of subclasses as to each is scrutinized.

### A

The most serious type of class conflict is one which was hinted at by Judge Sneed in *Green,* 541 F.2d at 1341. Judge Sneed observed that in/out plaintiffs benefit from maximizing the difference between inflation at purchase and inflation at sale. Therefore, in establishing the price and value lines, the in/out plaintiff's interest lies in minimizing the degree of price inflation existing at the date of sale. A retention plaintiff buying on that date (or, for that matter, another in/out plaintiff buying on that date) has an exactly opposite interest; i.e., such a person would seek to maximize the degree of price inflation existing on that date. In other words, different plaintiffs have conflicting incentives in shaping the evidence.

This "seller-purchaser" conflict has been raised by defendants in numerous courts, usually to no avail. Some courts have explained the conflict in some detail; see *Blackie v. Barrack,* 524 F.2d 891, 908 (9th Cir.1975); *In re LTV Securities Litigation,* 88 F.R.D. 134, 149 (N.D.Tex.1980); *Koenig v. Smith,* 88 F.R.D. 604, 607–608 (E.D.N.Y. 1980); *Tucker v. Arthur Andersen & Co.,* 67 F.R.D. 468, 482 (S.D.N.Y.1975); *Feldman v. Lifton,* 64 F.R.D. 539, 549 (S.D.N.Y.1974); *Greene v. Emersons Ltd.,* 86 F.R.D. 47, 61 (S.D.N.Y.1980) (citing *Blackie,* 524 F.2d at 908); other courts have engaged in only a brief discussion of the conflict. See *Simon v. Westinghouse Electric Corp.,* 73 F.R.D. 480, 484 (E.D.Pa.1977); *B & B Investment Club v. Kleinert's, Inc.,* 62 F.R.D. 140, 144 (E.D.Pa.1974); *In re Unioil Securities Litigation,* 107 F.R.D. 615, 622 (C.D.Cal.1985); *In re AM International, Inc., Securities Litigation,* 108 F.R.D. 190, 196 (S.D.N.Y.1985); *Seidman v. Stauffer Chemical Corp.,* [1986–1987] Fed.Sec.L.Rep. ¶ 92,868 at 94,233, 1986 WL 9803 (D.Conn.1986).

The common thread running through these cases is that despite the existence of the seller-purchaser conflict, a plaintiff class was certified. The justifications advanced for such decisions have varied. In *In re LTV Securities Litigation,* 88 F.R.D. 134 (N.D.Tex.1980), LTV had issued a restatement of earnings allegedly necessitated by questionable accounting procedures. After adopting the fraud-on-the-market theory and the out-of-pocket measure of damages, the court went on to address the possibility that the seller-purchaser conflict should preclude class certification. Id. at 149. The court rejected this contention and certified the class, noting that:

> available techniques of proof such as econometric modeling are sufficiently demanding of internal consistency as to re-

---

**27.** As discussed above, under the fraud-on-the-market theory, proof of the *existence* of price inflation is critical in establishing reliance, materiality, causation, and the existence of damages. See supra pp. 1357–1358. Furthermore, proof of the *degree* of price inflation at various points in the class period is necessitated by the out-of-pocket rule for calculating damages in corporate dissemination cases. See supra part I.C.2.

duce the opportunity for such manipulation of data.

Id. Similarly, the court later stated:

[d]efining the [amount of price inflation] through the class period as it follows the ups and downs of market activity within the traded security can be done only with sophisticated techniques of market analyses. This method reduces to one of remoteness the opportunity for any class representative to feather their [sic] own nest.

Id. at 152. This assertion that the nature of econometric analysis precludes individual plaintiffs from shaping evidence is, admittedly, an interesting one. Without the assistance of qualified econometricians, however, this court has great reservations about seeking comfort in such a sweeping generalization. The court cannot, therefore, conclude that this contention adequately resolves the seller-purchaser conflict.

One of the most insightful treatments of the seller-purchaser conflict appeared in an unrelated context, in *Foltz v. U.S. News & World Report, Inc.*, 111 F.R.D. 49 (D.D.C. 1986). *Foltz* involved a suit filed by former employees of U.S. News & World Report ("USNWR") alleging that the company, along with other named defendants, had purposefully undervalued the company's assets for an eight-year period. The plaintiffs were participants in USNWR's benefits plan, which distributed bonus shares of USNWR stock to the employees according to a predetermined formula. The number of shares issued each year was inversely dependent on the value of the company; the higher the value, the fewer the shares received. Because the company was not publicly traded, an outside auditor was called in to provide yearly appraisal services. When an employee separated from USNWR, he was required to offer back to the company all bonus shares he then held. These shares were redeemed in accordance with the most recent appraised value of the company.

The defendants moved for decertification of the class, asserting conflicting interests between the plaintiffs. The defendants argued that each plaintiff would seek to prove that the company was undervalued in the year in which he separated in order to prove that he received too little when he redeemed his bonus shares. On the other hand, a plaintiff-employee of USNWR who received bonus shares that same year (and separated in a later year) would have the opposite goal, because if the appraisal that year was too low, this plaintiff received too many shares.

Thus, the conflict in *Foltz* arose among class years, since all employees separating from the company in any given year had a unified interest in establishing undervaluation in that year. At a minimum, therefore, eight representatives would be needed, one for each year of the class period. Defendants claimed that each of these eight named plaintiffs would seek to maximize undervaluation in his own year, while disproving any undervaluation in the other class years. In response to this argument, the court observed:

the prudent course for any given class representative to take is not necessarily to attempt to maximize his and his class' recovery by taking the kind of extreme position that defendants suggest that he would want to take. To advocate such a position could very well be to risk ultimate defeat at trial, as the class representatives collide with one another in an attempt to prove that the US News stock was properly valued in one year but not another. In other words, each class representative could come to the conclusion that he would be better off working in conjunction with his fellows to demonstrate that the Company's stock was undervalued in every year, rather than setting out on a separate tack.

Id. at 54.

At first glance, this argument has a certain intuitive appeal. After all, if each of the eight representatives objected to a finding of undervaluation in every year but his own, the court would be faced with a seven-to-one argument, for every year, against a finding of undervaluation. At the same time, however, if each of the named plaintiffs works harmoniously with the others so as to maximize the undervaluation in every year, the recovery of each plaintiff is substantially reduced. If the mathematics worked out properly, any recovery obtained by one named plaintiff through

maximizing undervaluation in his year (with the cooperation of the remaining named plaintiffs) could be completely offset by the losses incurred in helping the remaining plaintiffs establish undervaluation in their years. In sum, it is not entirely clear that all representatives would work together to defeat everyone's recovery.

The same principles hold true in the context of a Rule 10b–5 case. It may be argued that all plaintiffs have an interest in cooperating with each other so as to avoid collective defeat. Yet if the in/out trader cooperates with those persons who purchased on the date that he sold, his recovery is necessarily diminished, perhaps even eliminated. It is not certain, therefore, that it is in the best interests of the in/out seller and the purchaser to cooperate. Furthermore, the class action device provides no viable mechanism for absent class members to cooperate, even if they desired to do so. Therefore, the seller-purchaser conflict remains a potent problem.

In *Koenig v. Smith,* 88 F.R.D. 604 (E.D.N.Y.1980), plaintiff alleged that the stock of the defendant Friendly Frost Corporation had been manipulated, thus causing artificial price inflation. In addressing the propriety of class certification, the court rejected defendants' argument that the seller-purchaser conflict made certification improper:

> defendants' argument about conflicts arising from proof of damages will not defeat certification. With few exceptions the courts have held that the availability of procedural devices such as *subclassing, Rule 23(c)(4)* and *separate trials* for liability and damage issues makes certification of the entire class of purchasers proper despite the potential conflict between purchasers who sell and those who hold their securities until after [a curative] disclosure.

Id. at 609 (citations omitted, emphasis added). Of the three "solutions" to antagonism advanced by the *Koenig* court, the last two can be disposed of quickly. The *Koenig* court made the common mistake of equating a conflict over price inflation with a conflict over damages. If a court were to address adequately the seller-purchaser conflict through separate trials or through a FRCP 23(c)(4) partial class action, the appropriate division would *not* be between liability, on the one hand, and damages on the other; instead, the division would be between misstatement/omission and scienter, on the one hand, and the existence and degree of price inflation [28] on the other. When viewed in this light, the wisdom of using a class action, or a partial class action, merely for the purpose of the misstatement/omission and scienter elements, appears questionable at best.

The first suggestion of the *Koenig* court—using subclasses to address the seller-purchaser conflict—has been made by virtually every court considering the problem. See *Blackie,* 524 F.2d at 911; *Green v. Occidental Petroleum Corp.,* 541 F.2d at 1346 (Sneed, J., concurring); *In re LTV Securities Litigation,* 88 F.R.D. at 149; *Tucker,* 67 F.R.D. at 482; *Feldman,* 64 F.R.D. at 549; *B & B Investment Club,* 62 F.R.D. at 144; *In re Unioil Securities Litigation,* 107 F.R.D. at 622; *In re AM International, Inc. Securities Litigation,* 108 F.R.D. at 196 n. 8; *Seidman,* [1986–1987] Fed.Sec.L.Rep. at 94,233; *Greene,* 86 F.R.D. at 62. But none of the reported cases has attempted to implement subclasses, and even a cursory consideration of this purported solution exposes its inefficacy.

Assume for the moment that for the purpose of determining price inflation, the price line and the value line readings are to be determined once for each *day* of the class period, using a *daily* average.[29] For a security with a high trading volume, such as Seagate, it is likely that on each day of the class period there is at least one sale by an in/out trader. Such a sale, of course, would have at least one corresponding purchaser.

---

28. As discussed above, proof of the existence and degree of price inflation contributes toward establishing the Rule 10b–5 elements of reliance, damages, materiality, and proximate cause. See supra pp. 1357–1358.

29. Compare this assumption to price line and value line readings which are determined in accordance with some other time increment, e.g., on a weekly or hourly basis, using weekly or hourly averages.

Therefore, in the limit, for each day of the class period, two subclasses would be needed: one for all plaintiffs who purchased shares on that day (and thus wish to shape the evidence to maximize the amount of price inflation in existence); and another for all in/out plaintiffs who sold shares on that day (and thus wish to minimize, or deny the existence of, any price inflation). Even under these circumstances, the great difficulty which would accompany any attempt to delineate and maintain subclasses is readily apparent.

The assumption of using a daily average, which ensured that a maximum of two subclasses per day would be needed, is not, however, a realistic one. In actuality, the price line and value line need to be determined *at each transaction;* otherwise, a plaintiff may not recover his full damages where the average price inflation for the day is lower than that prevailing at the time of purchase. Therefore, the upper limit on the number of subclasses which may actually be warranted is two times the number of transactions occurring in the class period. When the additional forms of antagonism discussed below are also considered, it is inevitable that reconciliation of these conflicts would require so many class representatives and subclasses that a class action would become utterly unworkable.

B

The second form of conflict likely to arise in corporate dissemination cases stems from the dual interests held by some members of the plaintiff class. Specifically, those plaintiffs who still own shares of the relevant security at the date of suit have divided loyalties: on the one hand, they hope for recovery for themselves; as equity holders in the relevant issuer, however, they also wish to minimize the overall liability of the company.[30]

In numerous cases, defendants have therefore argued that a schism might be anticipated in the class between equity holders and non-equity holders; while the former attempt to hold down the aggregate damage award, the latter are indifferent to the total cost to the company. Just as with the seller-purchaser conflict, however, defendants have had little success in preventing class certification on the basis of this "equity" conflict. See *Herbst v. Able,* 47 F.R.D. 11, 15 (S.D.N.Y.1969); *Herbst v. International Telephone and Telegraph Corp.,* 495 F.2d 1308, 1314 (2d Cir.1974); *Madonick v. Denison Mines Limited,* 63 F.R.D. 657, 658–59 (S.D.N.Y.1974); *Jenson v. Continental Financial Corp.,* 404 F.Supp. 806, 811 (D.Minn. 1975); *Simon v. Westinghouse Electric Corp.,* 73 F.R.D. 480, 484 (E.D.Pa.1977); *Greene v. Emersons Ltd.,* 86 F.R.D. 47, 61 (S.D.N.Y.1980).

The reasons advanced by the courts in concluding that the equity conflict does not destroy adequacy of representation have been few in number. One of the earliest cases to address this conflict was *Herbst v. Able,* 47 F.R.D. 11 (S.D.N.Y.1969). In *Herbst,* plaintiffs claimed that misleading statements by the defendants had caused plaintiffs to convert their debentures into common stock and thereby incur a loss. By the time of suit, some members of the plaintiff class had sold their common stock while others still retained their shares. In responding to defendants' argument that class certification was improper due to the equity conflict, the court noted:

[p]ractically every class action that can be brought under the Securities Acts by purchasers of securities involves claims both by those who retained their securities and those who sold them or by those who sold some securities, but still retain others. The answer to this problem is twofold. On the one hand, it is simply that every defrauded shareholder wears two hats, but that his personal interest far overshadows his interest as an equity-holder. Moreover, if, by chance, any class member currently has holdings of [the defendant issuer's] stock so large that he would prefer not to assert his claims for past losses,

---

**30.** Of fundamental importance here is the fact that in the vast majority of cases, the issuer of the security, as opposed to the individuals responsible, ultimately pays the damage award either through indemnification agreements or the procurement of directors' and officers' liability insurance.

such a person * * * always has the option under [FRCP] 23(c)(2) to request exclusion from the class.

Id. at 15.

This same reasoning was adopted by the Second Circuit in a slightly different context in *Herbst v. International Telephone and Telegraph Corp.*, 495 F.2d 1308, 1314 (2d Cir.1974). In that case, plaintiffs alleged that defendant ITT had included misleading statements in a prospectus issued pursuant to ITT's acquisition of the Hartford Fire Insurance Company. Plaintiffs, who were former shareholders of Hartford and who had agreed to a one-for-one stock swap, claimed that had the prospectus been truthful, many of the Hartford shareholders would have accepted the exchange offer only at a higher price. As might be expected, at least some of the plaintiffs had disposed of their ITT stock by the time of suit. The court held that any concern on the part of the plaintiffs that a damage award could harm ITT was far outweighed by their personal interest in recovery. Id. at 1314 (citing *Herbst v. Able*, 47 F.R.D. 11, 15 (S.D.N.Y. 1969)). The conclusion of *Herbst v. International Telephone and Telegraph Corp.* has been the basis of other court holdings as well. See, e.g., *Madonick v. Denison Mines Ltd.*, 63 F.R.D. 657, 659 (S.D.N.Y.1974); *Greene v. Emersons Ltd.*, 86 F.R.D. 47, 61 (S.D.N.Y.1980).

This rationale, despite its widespread acceptance, is highly questionable. If, in fact, the individual plaintiff is more interested in personal recovery than the overall welfare of the company, this only addresses the reason for that individual's participation in the class suit. The mere fact that he prefers himself over the corporation in no way indicates that he would be agreeable to hundreds or thousands of other plaintiffs receiving damage awards at the expense of the company in which he possesses equity. The second justification advanced in *Herbst v. Able*, that those holding substantial equity interests have the right to opt-out, thus also misses the point. The issue is not whether such a plaintiff is going to be forced to participate; rather, the concern is whether once he decides to join the class, he will work against those persons in the class who do not hold continuing equity interests.

Although it is not clear, this point may have been implicitly recognized by the court in *Wood v. Rex–Noreco, Inc.*, 61 F.R.D. 669 (S.D.N.Y.1973), where the court refused to certify a class action. In *Wood*, the court was faced with class representatives who not only purchased some 2,900 shares during the period of artificial price inflation, but also owned 6,000 shares prior to the first alleged misrepresentation. At the date of suit, the named plaintiffs still held all 8,900 shares. In concluding that class certification was improper, the court stated:

> [p]laintiffs, as allegedly defrauded shareholders, are seeking damages from the corporation and the individual defendants. However, as holders of the 6,000 shares purchased prior to [the first misrepresentation], plaintiffs also have a substantial shareholder interest in Rex–Noreco's remaining an ongoing enterprise. In view of these substantial and conflicting interests, the plaintiffs have not shown that they can adequately represent the interests of the class of purchasers of Rex–Noreco stock after the alleged misrepresentations, a class whose interest is in the recovery of damages from the corporation.

Id. at 674.

Interestingly, the decision of the *Wood* court hinged on the fact that at the date of suit, the named plaintiffs still owned the 6,000 shares which they had obtained prior to the class period. The court suggested that it was these shares, as opposed to the 2,900 purchased in the class period, which gave rise to the fatal equity conflict. Id. This court fails to see the logic of this particular distinction; the relevant inquiry should instead be whether a plaintiff has an equity interest at the date of suit. Therefore, so long as a plaintiff purchased some shares in the class period, the date of acquisition of other shares is irrelevant. And as long as at least one plaintiff in the class owns shares at the date of suit, the *Wood* decision is pertinent, and the equity conflict is presented.

The final justification given by courts for rejecting the equity conflict as being fatal to class certification is a familiar one: the possi-

bility of using subclasses. See *Herbst v. Able,* 47 F.R.D. at 15; *Madonick,* 63 F.R.D. at 659. At first glance, subclasses may appear to be a possible solution, since it would be relatively easy to determine which of the plaintiffs had an equity interest in the relevant issuer on the date of suit. But the nature of the dual interests of those holding stock at the date of suit actually makes the use of subclasses impractical.

An equity-holding plaintiff may, of course, decide to seek from the defendant company the damages he suffered due to the alleged fraud. But as an equity holder, this plaintiff may well seek to defeat the other class members' recoveries. In doing so, this plaintiff is not likely to be interested in whether the class members whose recoveries he prevents are equity holders or non-equity holders. In other words, his antagonism will not discriminate; both equity holders and non-equity holders will find themselves opposed by this equity-holding plaintiff.

When the full scope of the equity conflict is thus analyzed, the viability of subclasses is destroyed. In the limit, each equity holder will require his own subclass, since each seeks to maximize his recovery while destroying that of his fellow class members. When considered in conjunction with the seller-purchaser conflict discussed above, the futility of using subclasses as a solution is obvious.

## IV

The two forms of conflict identified above, troubling as they are, are all the more problematic in cases involving partial curative disclosures. Admittedly, these conflicts are not limited to partial disclosure cases. The seller-purchaser conflict exists whenever the level of price inflation during the class period fluctuates; due to the formula used to calculate in/out damages, see supra part I.C.2, any downward movement in the level of price inflation, whatever the reason, will give rise to this type of conflicting interest. The equity conflict, on the other hand, exists in virtually all cases, as every equity-holding plaintiff is simultaneously interested in both personal recovery and the minimization of the firm's liability.[31]

Still, cases involving partial curative disclosures give rise to greater cause for concern. As developed below, the making of such partial disclosures necessarily implies that: (1) there will be a greater potential for the presence of in/out traders in the plaintiff class; and (2) the damages suffered by these in/out traders will be more significant. And in cases where the plaintiff class actually does include a significant number of in/out plaintiffs, the resulting seller-purchaser conflicts, when combined with the equity conflicts, may preclude satisfaction of the adequacy of representation prerequisite of FRCP 23. To understand these phenomena, it is necessary to compare the ordinary one-time full disclosure case to the partial curative disclosure scenario.

In the full disclosure case, absent leakages, some fluctuation in the level of price inflation during the class period is to be expected. As the Ninth Circuit recognized in *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433 (9th Cir.1987), the degree of price inflation may change " 'as a result of market forces operating on the misrepresentations.' " Id. at 1437 (quoting *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1345 (9th Cir.1976) (Sneed, J., concurring)). Yet, because by assumption there are no leakages and no partial disclosures, one can expect that the degree of price inflation will remain substantially constant; the variations which occur are thus likely to be oscillations around some base value. Nevertheless, these small changes do give rise to in/out damages for any plaintiff who purchased stock in the class period at a certain price inflation, and sold in the period at a slightly lower inflation. But because the fluctuation in price inflation will presumably be slight, these in/out plaintiffs are not likely to have suffered a great amount in damages.

Turning to the partial curative disclosure case, the differences are immediately appar-

---

**31.** This court, faced with a *partial disclosure* case, need not determine whether the seller-purchaser and/or equity conflicts are serious enough to preclude class certification in the ordinary *one-time full disclosure* case.

ent. While a one-time full disclosure completely eliminates existing price inflation all at once, a partially curative disclosure can be expected to decrease the level of price inflation only proportionately. Therefore, the issuance of a series of partial disclosures creates a sort of "step effect" in the amount of price inflation: each such disclosure partially ratchets down the amount of inflation (the vertical part of the "step"), and the level of inflation then remains more or less constant[32] (the horizontal portion of the "step") until the next partial disclosure. Only when the final partial disclosure is issued does the price inflation completely disappear.

The implications of this difference are twofold. First, because of the discreet "steps" created by such disclosures, there is an increased potential for the presence of in/out traders in the plaintiff class. In the one-time full disclosure case, not every person who both purchased and sold in the period is entitled to recovery; the slight fluctuations which occur may mean that some plaintiffs sell at price inflation levels equal to or higher than that at which they bought. In the partial disclosure case, this remains true for persons who both bought and sold during a period in which the amount of available information was constant—i.e., during the horizontal portion of a single "step." On the other hand, *all* persons whose transactions branch across "steps" will be entitled to in/out damages. In other words, any person who purchased stock during one sub-period of price inflation and sold after one or more partial curative disclosures will suffer in/out damages; by hypothesis, the partial disclosures will have decreased the level of inflation in the later sub-periods.

The second effect also follows from the step effect associated with partial disclosures. Because of the periodic significant downward steps in the amount of price inflation (as opposed to the slight fluctuations associated with full disclosure cases), in/out damages will be greater. This is true simply because the damages formula suggests that in/out damages are maximized the greater the difference between the price inflation at

purchase and the price inflation at sale. See supra part I.C.2.

All of this suggests that a court, when faced with a partial curative disclosure case, ought to be considerably more wary in making a class certification decision than in a full disclosure case. Because the partial disclosure case increases the chances of finding in/out traders in the plaintiff class, there is a concurrent increase in the probability that the seller-purchaser conflicts in the class will be severe. And when combined with the ever-present equity conflict, the alignment of interests necessary for the FRCP 23 requirement of adequacy of representation may well be lacking.

 Nevertheless, it is still possible in a partial curative disclosure case to have a relatively small proportion of in/out traders in the plaintiff class. Therefore, the precise composition of the plaintiff class, and the resultant extent and severity of class conflicts, are factual inquiries which must be made on a case-by-case basis. The court concludes that in order to obtain class certification, the plaintiffs in a partial curative disclosure case must demonstrate that the putative class is not so filled with in/out traders so as to render the resulting conflicting interests problematic. Only if plaintiffs are able to establish that a significant majority of the plaintiff class consists of retention plaintiffs can the court be assured that the antagonism in the class is not so severe as to make representation inadequate. In other words, plaintiffs must establish that retention plaintiffs in the class will, to borrow a phrase, "predominate" over in/out plaintiffs.

The court recognizes that granting class certification when the proportion of in/out traders in the class is relatively low may still result in compromised representation. After all, even if only one in/out trader is in the class, the seller-purchaser conflict will arise as between this in/out plaintiff and those plaintiffs who purchased stock at or around the same time. And, of course, the equity conflict is always lurking in the background. But, in the interest of accommodating the

---

**32.** Again, *Wool* predicts that each intermediate level of price inflation may not be perfectly constant, as slight variations may occur around some base level.

strong sentiments which favor the use of class actions in securities fraud cases, see supra p. 1350, the court concludes that certain minimal levels of antagonism must be tolerated.

 Turning first to the interests of in/out traders, a plaintiff class composed primarily of retention traders will clearly result in prejudice to the in/out plaintiffs' interests. Although this is troubling, it should not preclude class certification.

The in/out plaintiff presents a special situation. Because he necessarily bought and sold in the relevant period, he has one interest in shaping the evidence for the moment at which he bought, and the opposite interest for the moment at which he sold. Where a plaintiff class is comprised solely of retention plaintiffs except for one in/out trader, the latter's interests, of course, are likely to be substantially prejudiced. But even if a class were composed entirely of in/out plaintiffs, the seller-purchaser conflicts would still be pervasive.[33] In other words, the in/out plaintiff must deal with the inevitable fact that if he attempts to participate in a mass suit along with other injured traders (whether in/out or retention), his interests will be compromised.

For this reason, the court cannot concern itself with the prejudice that the in/out plaintiff may face in a class composed primarily of retention plaintiffs, as the in/out plaintiff will *always* face such adverse interests when participating in a class action. The in/out trader's recourse, though not attractive, is to opt-out of the class and sue individually. Unfortunately, the in/out plaintiff's dilemma of either suing individually or facing adverse interests is one which this court can do little to alleviate, as it is a direct result of the out-of-pocket measure of damages.

 Therefore, it is the potential for prejudice to retention plaintiffs which must guide the court in determining the point at which class certification is no longer proper. When the proportion of in/out plaintiffs in the class is relatively low, the retention plaintiffs in the class are not likely to be seriously

prejudiced by the seller-purchaser conflict. This is true simply because of the relevant numbers—a large number of retention plaintiffs will handily defeat a smaller number of in/out plaintiffs in shaping the evidence.

As the number of in/out traders in the class increases, so, too, does the severity of the seller-purchaser conflict. See supra part III.A. At some point, the interests of the retention plaintiffs become unduly impinged upon by the combination of the seller-purchaser conflicts with the lurking equity conflicts. The court feels that this point is reached where the retention plaintiffs in the class no longer "predominate" over the in/out plaintiffs. So long as retention plaintiffs do predominate, their interests are adequately protected.

As discussed above, plaintiffs must provide evidence establishing that to the extent conflicts exist in the plaintiff class, they are not so serious as to preclude a finding of adequacy of representation. In order to provide plaintiffs an opportunity to meet this burden, the court will conduct an evidentiary hearing. The following suggestions are made to guide the parties in their presentations.

First, plaintiffs should provide proof regarding the extent and severity of both the seller-purchaser and equity conflicts. Although it is the seller-purchaser conflict which is exacerbated by partial curative disclosures, it is the cumulative effect of both types of conflict that is particularly troubling. Second, plaintiffs must establish both the level of price inflation and the trading volumes in Seagate common prevailing during the class period. From these data, plaintiffs should be able to ascertain the nature of the damages (in/out or retention) suffered by the various class members and, therefore, the proportion of the plaintiff class that is comprised of in/out traders, and the fraction composed of retention plaintiffs.

The court realizes that to request plaintiffs to provide such proof before the class certification decision seems to depart from the rule set forth in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53,

---

**33.** This is true, of course, because the point in time at which one in/out trader sold his shares may be the point at which another in/out plaintiff purchased.

40 L.Ed.2d 732 (1974), which prohibits an examination of the merits of plaintiffs' case as part of the certification analysis. In *Eisen*, the district court had imposed upon the defendants 90% of the costs of sending notices to putative class members, reasoning that plaintiffs were "more than likely" to prevail on the merits. The Supreme Court held that:

> nothing in either the language or history of Rule 23 * * * gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.

Id. at 177, 94 S.Ct. at 2152. The Court reasoned that a contrary rule would provide the representative plaintiff with a determination of the merits of the class action even before the prerequisites to class certification had been satisfied. Id. at 177–78, 94 S.Ct. at 2152–53. The Court also noted that to allow such an examination of the merits could result in "substantial prejudice" to the defendant, because the usual procedures available in a full trial would be unavailable. Id. at 178, 94 S.Ct. at 2153.

The *Eisen* case was decided in 1974, before the Ninth Circuit's adoption of the fraud-on-the-market theory in *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975), and well before the Supreme Court's 1988 endorsement of the theory in *Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). As discussed above, the advent of the fraud-on-the-market theory has magnified the severity of certain class conflicts, particularly in partial curative disclosure cases. In order to ensure that the FRCP 23 requirement of adequate representation is satisfied, the court is forced to examine evidence which prior to the fraud-on-the-market theory, would have been presented as part of the merits of the case.

Given the relative recency of the decision in *Basic*, the court concludes that the *Eisen* rule prohibiting examination of the merits during the class certification process must yield. By adopting the fraud-on-the-market theory, the *Basic* court implied, though perhaps unintentionally, that the district courts *must* examine some of the mer-

its. Because of the potential for conflicts created by the fraud-on-the-market theory and the out-of-pocket measure of damages, the adequacy of the representation cannot be ascertained without examining the composition of the class. And there is simply no way to discover the makeup of the class without investigating the trading volumes and the amount of price inflation prevailing during the class period. Accordingly, this court has little choice but to resort to an evidentiary hearing on these issues.

## V

The court next turns to defendants' motion for summary judgment on plaintiffs' fraud-on-the-market claim. The motion is based on three arguments. First, defendants present an "event analysis" which purports to establish that the market was never biased by any alleged misstatements by defendants. Second, defendants argue that they had no affirmative duty to disclose adverse financial information to the public any earlier than they did. Third, defendants assert that they are entitled to summary judgment on the issue of scienter. Plaintiffs have brought a cross-motion for partial summary judgment claiming that Seagate's stock was biased as a matter of undisputed fact.

Summary judgment is a method for the prompt disposition of an action in which there is no genuine issue of material fact. Federal Rule of Civil Procedure 56(c) provides for the granting of summary judgment where the moving party is entitled to judgment as a matter of law. The burden of establishing that there is no genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has met that burden by presenting evidence which, if uncontradicted, would entitle it to a directed verdict at trial, FRCP 56(e) shifts to the nonmoving party the burden of presenting specific facts showing that such contradiction is possible. *British Airways Board v. Boeing Co.*, 585 F.2d 946, 950–52 (9th Cir.1978).

## A

Earlier in this litigation, defendants had moved for summary judgment based on their assertion that the market was unaffected by defendants' misstatements and omissions. In rejecting this "truth on the market" defense, the court noted:

> When * * * courts can with the level of confidence required by FRCP 56 find no reasonable possibility of systematic bias by examining certain news accounts, analyst reports or other such evidence, a truth on the market defense may be appropriate. Where such evidence is not so persuasive, as here, a defendant must attempt a more convincing demonstration that the misstatements or omissions alleged did not bias the market. Such demonstration may take the form of a time event or comparable index study, both of which are commonly used in securities fraud cases.

*In re Seagate Technology II Securities Litigation,* 802 F.Supp. 271, 277 (N.D.Cal.1992). Accordingly, defendants have performed such an "event analysis" and now again move the court for summary judgment.

■ Defendants' expert, Dr. Kleidon, conducted the econometric "event study" by noting the movement of the price of Seagate common for each day in the class period and comparing it with an industry index.[34] According to Dr. Kleidon, most of the variation in the price of Seagate stock during the class period can be attributed to movements in the industry index. Kleidon Dec ¶ 12. As for the dates on which the price of Seagate common deviated from the industry index in a statistically significant amount, Dr. Kleidon posited that the disclosures issued by the company on those dates were primarily responsible. Thus, Dr. Kleidon concluded that "[n]one of the allegedly false and misleading statements cited in the complaint resulted in a significant increase in stock price, properly adjusting for general market and industry effects." Kleidon Dec ¶ 3(b).

According to defendants, this event study "objectively establishes the market was not misled" by defendants' statements and that defendants cannot be liable for any fraud on the market. Defendants' Mem. in Supp. at 4–8. The court disagrees with the sweeping conclusion that the study absolves defendants of *all* fraud-on-the-market liability. The expert analysis simply shows that plaintiffs' claims for liability based on *affirmative misstatements* cannot succeed; the study has no impact, however, on the viability of those claims based on the omission of material information.[35]

Defendants' expert analysis in this case conclusively shows that none of defendants' affirmative corporate disclosures caused a statistically significant variance in the relative price of Seagate stock. Because plaintiffs have failed to rebut this evidence, defendants' summary judgment motion as to all claims based on affirmative misstatements is hereby **GRANTED.**

But as to plaintiffs' allegations that the price of Seagate common was fraudulently inflated by the *omissions* of defendants, the expert analysis of Dr. Kleidon is of little import. After all, it is entirely plausible that while defendants made affirmative statements which failed to impact the trading price of Seagate common, they simultaneously withheld information from the market which rendered the statements misleading. Of course, one would not expect the withholding of such information to affect the trading price of Seagate stock: the market cannot react to what it does not know.

■ Defendants' attempt to obtain summary judgment on plaintiffs' omissions claims is in any event premature. In order to establish a "truth on the market" defense to an omissions claim, defendants must prove that despite the withholding of material information, the price line never diverged from the value line;[36] in other words, defendants

---

34. See supra part I.C.1 for a discussion of the methods used in performing such event studies.

35. As discussed above, fraud-on-the-market liability can arise either where an affirmative misstatement is made by the corporation, or where the corporation omits material information from a disclosure. See supra part I.B.

36. See supra part I.C for a discussion of the "price line" and the "value line."

must establish that there was never any price inflation because the market already knew the withheld information. The existence and degree of price inflation are two of the issues the court has determined are to be developed at an evidentiary hearing on the propriety of class certification. See supra part IV. Therefore, defendants' summary judgment motion on the omissions claims would be more appropriately brought after that hearing. Because defendants have thus far failed to produce evidence which demonstrates the absence of price inflation, defendants' motion for summary judgment on the omissions claims is hereby **DENIED** without prejudice.

### B

■ In considering fraud-on-the-market claims brought for omissions of material information, it is important to note that generally, the corporation has no affirmative duty of disclosure. In certain circumstances, however, the corporation *does* have a duty to disclose information unknown to the public. For example, it is beyond question that when an issuer of public stock makes a voluntary disclosure it must be true in its entirety and "not misleading" by omission of information "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." SEC Rule 10b–5; *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Dirks v. S.E.C.*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983).[37]

Defendants have moved for summary judgment based on two contentions. The first is that defendants had no duty to disclose the alleged material information to the investing public. The second is that defendants are entitled to summary judgment on the issue of scienter. The court finds neither argument convincing.

### 1

In response to defendants' contention that they were under no duty to disclose information regarding Seagate, plaintiffs seek to impose such a duty under two different theories. First, plaintiffs attempt to rely on the duty to disclose which arises under insider trading law. Second, plaintiffs suggest that defendants made affirmative statements which were materially misleading due to the omission of critical information.

Plaintiffs first seek to establish a duty to disclose based on the alleged insider trading of two of the individual defendants. Under the laws covering insider trading, a corporate insider with material, non-public information has a duty either to disclose the information to the person with whom he trades, or to abstain from trading. According to plaintiffs, this court should import this duty to disclose or abstain into this case involving fraud-on-the-market.

■ The court declines to adopt plaintiffs' rationale. Such a rule, when applied in fraud-on-the-market cases, would lead to enormous liability on insider traders—liability that could not have been anticipated by Congress. See 15 U.S.C. § 78t–1 (limiting standing for insider trading claims to plaintiffs that "contemporaneously" bought or sold securities of the same class). Plaintiffs' rule could potentially subject a low level employee/insider, who traded in only a few shares of stock, to broad liability for fraud on the entire market. See *Colby v. Hologic*, 817 F.Supp. 204, 216 (D.Mass.1993) (" * * * to extend liability 'well beyond the time of the insider's trading could make the insider liable to all the world' "). And as another court noted:

"In contrast to a fraud-on-the-market scheme, insider trading does not artificially boost or deflate the market price of a stock aside from typically negligible supply and demand adjustments. Accordingly, the

---

**37.** See also *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 756 (3d Cir.1984) ("If a corporation is not trading in its securities and is not otherwise under a duty to disclose material corporate information, but it voluntarily chooses to make a public statement, if that statement is 'reasonably

calculated to influence the investing public * * *' the corporation has a duty to disclose sufficient information so that the statement made is not 'false or misleading or * * * so incomplete as to mislead * * *' ").

remedy for wrongful insider trading is disgorgement of trading profits and is only available to actual or potential victims of the insider trades."

*In re Aldus Securities Litigation,* 1993 WL 121478, 1993 U.S.Dist. LEXIS 5008, CCH Fed.Sec.L.Rep. ¶ 97,376 (W.D.Wash.1993). Because plaintiffs here were not contemporaneous traders during the alleged insider trading, they have no standing to assert the duty to disclose imposed upon insider traders.

Plaintiffs also argue that a duty to disclose arose here because defendants made statements which were materially misleading due to omitted information. According to plaintiffs, defendants withheld material information regarding Seagate's "severe excess capacity." Second Consol.Amended Compl. ¶ 61 a–q at 34–36. Plaintiffs maintain that this excess capacity was caused by overexpansion of Seagate's manufacturing facilities, declining market demand for the 5¼ inch rigid disk drives to which these facilities were geared, and a bloated inventory of such disk drives. Id. All of this allegedly contributed to Seagate's overall financial difficulties, which were also undisclosed until Seagate announced on October 5 that it would suffer a loss in the quarter ended on September 30.

Plaintiffs further allege that affirmative statements made during the class period were materially misleading due to the above omissions. For example, plaintiffs present evidence that on May 3, 1988, defendant Shugart reported to a group of securities professionals that because of the rising demand for disk drives, Seagate had to increase its manufacturing capacity to maintain marketshare. See Sidener Dec.Exh. 8. Also, on June 29, 1988, Seagate publicly confirmed that it was raising prices on some of its disk drives due in part to "very heavy demand." See Sidener Dec.Exh. 10. Both of these disclosures came only one or two months before Seagate's revelation on July 18 and August 1, 1988, that Seagate was suffering severe financial losses. According to plaintiffs, these allegedly misleading disclosures gave rise to a duty to disclose in the defendants.

█ Defendants suggest that the statements identified by plaintiffs were not misleading because they were literally true. This argument misses the point. Even if the court assumes that the corporate disclosures were literally true, this does not mean that the statement did not give rise to a duty to disclose. As stated by the court in *In re Convergent Technologies Securities Litigation,* 948 F.2d 507, 516 (9th Cir.1991):

> Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.

*Convergent Technologies,* 948 F.2d at 512. Thus, defendants may not rely on the literal truth of their statements to support their summary judgment motion.

In sum, defendants have failed to convince the court that summary judgment is warranted based on a lack of a duty to disclose. Accordingly, defendants' summary judgment motion on that ground is hereby **DENIED.**

2

Defendants also contend that they are entitled to summary judgment because none of the allegedly misleading statements were made with the requisite scienter. In the Ninth Circuit, scienter has been interpreted to include recklessness. See *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1117 (9th Cir.1989).

Defendants contend that the their "overall pattern of conduct is inconsistent with an intent to defraud." Defs Mem in Supp at 16. Defendants Shugart and Waite also submit self-serving affidavits denying any fraudulent intent in selling their shares of Seagate stock during the class period. See Shugart Dec. ¶ 5–7; Waite Dec. ¶ 5.

First and foremost, defendants have not satisfied their initial burden on the scienter issue because they have not submitted any evidence tending to show that they were not *reckless* in making the challenged statements. Instead, all of defendants' evidence goes only to disproving *bad faith*.

██ Even assuming that the evidence presented was sufficient to satisfy defendants' initial burden on a summary judgment motion, the court finds that plaintiffs have presented enough evidence to create a triable issue of fact on the issue of scienter. Plaintiffs submit evidence suggesting that while defendants knew that the market for 5¼ disk drives was shrinking, they made statements designed to maintain public confidence not only in Seagate, but also in the 5¼ disk drive market.

First, plaintiffs have presented an internal Seagate memorandum dated one month prior to Seagate's announcement that it was raising prices on certain disk drives. This memorandum acknowledges the slow demand for one of its main 5¼ inch drives and posits that the shrinking demand was due in part to oversupply and the low relative margins that customers receive on the drives. See Sidener Dec.Exh. 29.

More importantly, plaintiffs have submitted evidence of a motive for defendants to mislead the public with their statements. It is undisputed that during the class period, Seagate found itself well behind most of the industry in developing marketable 3½ inch disk drives. On the other hand, Seagate still retained a substantial share of the 5¼ inch disk drive market. Plaintiffs have produced what is apparently an internal Seagate memo outlining a strategy designed to "buy time" for Seagate to develop its own 3½ inch drives. The strategy was to delay the shift (by personal computer manufacturers) to the new 3½ inch drives by introducing a "hot" new family of 5¼ drives. See Sidener Dec.Exh. 33.

This demonstrates that at the very least, Seagate was aware that the future market for 5¼ inch drives was shrinking. It also shows that Seagate had a motive to maintain public confidence in the 5¼ drive until it could develop a marketable 3½ inch disk drive. This goal could logically be accomplished by hiding the fact that the industry was moving to a type of drive that Seagate had not yet fully developed. When this evidence is seen against the background of Seagate's subse-

quent statements to the public predicting "very heavy demand" for Seagate's disk drives in the future and assuring the market that per-unit sales of Seagate's products (which were mostly 5¼ inch disk drives at the time) were going to increase substantially, an inference of defendants' scienter can surely be drawn.

Finally, evidence that two of the defendants engaged in suspicious trading of Seagate stock during the class period is also probative of their scienter. Defendant Shugart sold 125,000 shares of Seagate stock (30% of his total holdings) in April 1988 when the price of the stock exceeded $20 per share. Shugart Dec ¶ 2. By October 1988, the end of the class period, the price of the stock was down to almost $7 per share. According to plaintiffs' evidence, on November 8, 1988, Shugart bought back 100,000 shares of Seagate stock at an average price of $7.31. Sidener Dec.Exh. 24.[38] The timing and amount of the transaction is suspicious enough to support an inference of scienter. See *Apple Computer Securities*, 886 F.2d at 1117 ("Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter"). Based on this evidence, a reasonable juror could find that Shugart had a motive to mislead the public: by maintaining the price of Seagate stock at an artificially high level, he could cover his tracks from potential insider trading charges.

In *Apple Computer Securities*, the Ninth Circuit held that the inference of scienter created by suspicious insider trading was defeated by uncontroverted deposition testimony that the trading was consistent in timing and amount with a past pattern of sales, or was wholly motivated by innocent purposes (e.g., the stock sale was necessitated by a need to free up assets to satisfy matured tax liabilities). Id. Here, defendants have not presented evidence that these sales were consistent in timing and amount with a past pattern of sales. Moreover, Shugart has not presented any innocent explanations for his trading. All he has sworn to is that he sold stock, that he used the proceeds to

---

**38.** This evidence was not objected to by defendants; therefore, any subsequent hearsay objection will be deemed waived. See William

Schwarzer, A. Wallace Tashima, & James Wagstaffe, *Federal Civil Procedure Before Trial*, § 14:111 (The Rutter Group, 1993).

"pay off certain debts and obligations and diversify [his] assets," and that he generally had no intention of taking advantage of an allegedly inflated stock price. Shugart Dec. ¶¶ 2, 3, 5. Notably absent is a statement that the stock sale was *necessitated* by his need to pay off mature debts.

The simple fact that Shugart used some unspecified portion of the proceeds from the sale to pay off various unidentified debts and obligations is not enough, in itself, to defeat the inference of scienter. It is not uncommon for a person who has come into a windfall of money to choose to pay off debts and obligations with the proceeds. Similarly, a general assertion of good faith in a self-serving affidavit is not enough to defeat the inference.

In sum, plaintiffs' evidence is sufficient to create a triable issue of fact on defendants' scienter. Accordingly, defendants' motion for summary judgment on the issue of scienter is hereby **DENIED.**

## C

Plaintiffs have brought their own cross-motion for summary judgment, arguing that as a matter of law, the price of Seagate stock was subject to a systematic, non-random bias during the class period as a result of defendants' omissions and misrepresentations. In support of their motion, plaintiffs rely on the fact that Seagate stock prices dropped sharply after the alleged partial curative disclosures by the company [39] on July 18, 1988, and August 1, 1988. Furthermore, plaintiffs point to defendants' own expert analysis, which concludes that the information contained in the announcements sparked the decline in stock price. See Kleidon Dec. ¶¶ 31–34.[40]

■■■ As the court noted in its prior order, evidence that there was a significant drop in stock price after the July and August disclosures is not "sufficient by itself to establish materiality, because the change in price may be caused by new information." See *Seagate*, 802 F.Supp. at 277. At the time the corporation made the allegedly misleading statements that gave rise to a duty to disclose, the corporation could have discharged its duty by disclosing all of the material information it knew at the time. This information would have included material data about the corporation's past and present operations. The required disclosure might also have included future projections, if necessary to make the statements made by the corporation not misleading.

But, the corporation could not have then known (and therefore could not have disclosed) concrete financial data about how the corporation would *actually* perform in the future. In other words, the drop in the stock price after the July and August disclosures could have been a response to two different pieces of information: (1) the disclosure of the previously withheld negative information; and/or (2) the non-fraud related facts which actually occurred (such as general poor performance of the company) during the period in which the fraud was undisclosed. The information in the second category is "new" because it reflects the outcome of risks that were only speculative at the time the misleading statements were made.

The "curative" statements in this case were comprised of not only the information that should have been disclosed at the outset, but also the "new information" about the corporation's performance subsequent to the date of the misleading statement. Therefore, the drops that followed the "curative disclosures" may have been attributable to the new financial information, and not the information that was required to be disclosed. Because plaintiffs have not presented sufficient evidence that the drop was attributable to the release of undisclosed information that the corporation had a duty to reveal at an earlier

**39.** See *Blackie v. Barrack*, 524 F.2d 891, 909 n. 25 (9th Cir.1975) (holding that a price drop in stock following a curative disclosure is evidence of price inflation).

**40.** The text of paragraph 34 of Dr. Kleidon's declaration states: "On August 2, Seagate's stock price dropped $1.250 per share. The residual price change was − 9.2% which is statistically significant. *The significant residual price change indicates that the information in the announcement was viewed by the market as significantly altering the total mix of information* (emphasis added)."

time, plaintiffs have failed to satisfy their initial burden under their summary judgment motion. Accordingly, plaintiffs' cross-motion for partial summary judgment on the bias and materiality issue is hereby **DENIED.**

IT IS SO ORDERED.